EDMUND G. BROWN JR.
Attorney General of the State of California
DANE R. GILLETTE
Chief Assistant Attorney General
GERALD A. ENGLER
Senior Assistant Attorney General
GREGORY A. OTT
Deputy Attorney General
RENÉ A. CHACÓN, State Bar No. 119624
Supervising Deputy Attorney General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 703-5957
 Fax:  (415) 703-1234
 Email:  rene.chacon@doj.ca.gov

Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ANDREW VIDEAU,** | No. C 07-3838 JSW (PR) |
| Petitioner, | |
| v. | |
| **A. HEDGEPETH, Warden,** | |
| Respondent. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER**

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  GREGORY A. OTT
   Deputy Attorney General
5  RENÉ A. CHACÓN, State Bar No. 119624
   Supervising Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-5957
    Fax:  (415) 703-1234
8   Email:  rene.chacon@doj.ca.gov

9  Attorneys for Respondent

10            IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13  **ANDREW VIDEAU,**                          No. C 07-3838 JSW (PR)

14                          Petitioner,    **MEMORANDUM OF POINTS
                                            AND AUTHORITIES IN**
15          **v.**                          **SUPPORT OF ANSWER**

16  **A. HEDGEPETH, Warden,**

17                          Respondent.

18

19

20                      **INTRODUCTION**

21          Petitioner, Andrew Videau, is presently serving a 50 years to life sentence for convictions

22  of first degree murder, Cal. Penal Code § 187(a), with findings with respect to the murder that

23  petitioner inflicted great bodily injury, Cal. Penal Code § 1203.075, and personally used and

24  discharged a weapon, Cal. Penal Code §§  12022.53(b)-(d),  12022.5(a)(1),  1203.06(a)(1),

25  1192.7(c)(8); possession of a firearm by a felon, Cal. Penal Code § 12021(c)(1); and unlawful

26  firearm activity, Cal. Penal Code § 12021(c)(1).  On December 17, 2007, petitioner filed the instant

27  first amended petition for writ of habeas corpus under 28 U.S.C. § 2254.  On March 31, 2008, the

28  Court issued the Order to Show Cause finding four cognizable claims:  (1) the jury instruction

1  pursuant to CALJIC No. 5.17 regarding imperfect self-defense, violated *Crane v. Kentucky*, 476 U.S.

2  683, 689-90 (1986), because it negated the defense of "lesser culpability;" (2) trial counsel was

3  ineffective in requesting CALJIC No. 5.17; (3) counsel was ineffective in failing to interview a

4  prosecution witness; and (4) the trial court violated petitioner's Sixth Amendment right to counsel

5  by making an inadequate inquiry into petitioner's complaints about counsel. *See* Order to Show

6  Cause.

7  **STATEMENT OF THE CASE**

8  By information, the Alameda County District Attorney charged petitioner with murder,

9  Cal. Penal Code § 187(a), possession of a firearm by a felon, Cal. Penal Code § 12021(a)(1), and

10  unlawful firearm activity, Cal. Penal Code § 12021(c)(1). *See* Respondent's Exhibit A at 142-45

11  (Clerk's Transcript hereinafter referred to as "CT"). With respect to the murder, the information

12  alleged the infliction of great bodily injury, Cal. Penal Code § 1203.075, and the use and personal

13  discharge of a weapon, Cal. Penal Code §§ 12022.53(b)-(d), 12022.5(a)(1), 1203.06(a)(1),

14  1192.7(c)(8). CT at 143. The information alleged one prior burglary conviction. CT at 144-45.

15  On March 22, 2004, trial by jury commenced. CT at 216. On March 23, 2004, petitioner

16  pleaded no contest to possession of a firearm by a felon and unlawful firearm activity. CT at 241.

17  On April 27, 2004, the jury found petitioner guilty of first degree murder and found the enhancement

18  allegations true. CT at 303.

19  On June 9, 2004, the trial court imposed a prison term of 50 years to life. CT at 311-15.

20  On February 21, 2006, the California Court of Appeal affirmed the judgment in an

21  unpublished decision. *See* Exhibit B.

22  On May 10, 2006, the California Supreme Court denied review. *See* Exhibit C.

23  On January 30, 2008, the California Supreme Court denied a habeas corpus petition. *See*

24  Exhibit D.

25  On June 11, 2008, the California Supreme Court denied a second habeas corpus petition

26  citing *In re Robbins*, 18 Cal.4th 770, 780 (1998), *In re Clark*, 5 Cal.4th 750 (1993), and *In re Miller*,

27  17 Cal.2d 734 (1941). *See* Exhibit E.

28  On December 17, 2007, petitioner filed the instant first amended petition for writ of

Memo. of Ps & As in Support of Answer - No. C 07-3838 JSW (PR)

habeas corpus under 28 U.S.C. § 2254.  On March 31, 2008, the Court issued the Order to Show Cause.

## LEGAL STANDARDS

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which imposes a "highly deferential" standard for evaluating state court rulings and "demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).  Under AEDPA, the federal court has no authority to grant habeas relief unless the state court's ruling was "contrary to, or involved an unreasonable application of," clearly established Supreme Court precedent.  28 U.S.C. § 2254(d)(1).  A decision constitutes an unreasonable application of Supreme Court law if the state court's application of law to the facts is not merely erroneous, but "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  Thus, "[o]nly if the evidence is 'too powerful to conclude anything but' the contrary" should the court grant relief.  *Edwards v. Lamarque*, 476 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  The petitioner bears the burden of showing that the state court's decision was unreasonable.  *Visciotti*, 537 U.S. at 25.

## STATEMENT OF FACTS

### May 6, 2001, Shooting Of Clifford Sutherland

On  May 6, 2001, at about 10:30 p.m., 16-year-old DeAndre Calhoun heard two males arguing outside his residence at 28th and Adeline Streets.  *See* Respondent's Exhibit I at 589, 592-93, 618 (hereinafter "RT") .  Calhoun poked his head outside the bathroom window and saw one male arguing with a neighbor, Clifford Sutherland, by Sutherland's car.  RT at 594-95, 597.  The men stood three to five feet apart.  RT at 598.  Believing they were about to come to blows, Calhoun went to another window to get a better view.  RT at 598-99, 603.  Calhoun saw Sutherland back away from the other male and say "no" three separate times.  RT at 605-06.  The other male had a tan plastic bag around his hand, holding something within.  RT at 605-06.  Sutherland had no weapon, nor did he advance on the other male.  RT at 606.  Calhoun next heard four gunshots discharged.  RT at 606-07.  Sutherland fell down and the male with the gun ran off.  RT at 610-12.

1  Later, Calhoun saw the shooter come back to the scene and tell police that he was looking for his

2  lost wallet.  RT at 614.  At trial, Calhoun identified petitioner as the shooter.  RT at 615.

3            Elvis Pitts was Sutherland's housemate at a residence they shared at 1928 Adeline Street.

4  RT at 747.  After Sutherland left to go to work, Pitts heard Sutherland cry out "David, David" before

5  hearing gunshots coming from outside.  RT at 753-54.

6            David Longsworth was another housemate of Sutherland's.  RT at 916.  Both men were

7  from Belize.  RT at 913.  After eating dinner on May 6, 2001, Sutherland left the residence to go to

8  his workplace.  RT at 920.  Soon, Longsworth recognized Sutherland's voice crying out

9  Longsworth's name.  RT at 921.  At a window, Longsworth ducked when he heard four to five

10  gunshots fired.  RT at 923.  Longsworth saw someone walking away from the scene holding a bag

11  in his left hand and in the right hand holding "something else."  RT at 924-25.  The suspect left in

12  a two-door tan Acura.  RT at 927.  Later, at the scene, Longsworth identified petitioner as the

13  suspect, noting that petitioner wore different clothes but had the same build, complexion, hair and

14  height as the shooter.  RT at 935.

15  **Forensic Evidence**

16            Oakland Police Officer Brett Estrada was one of the first on the scene.  A black male with

17  gunshots wounds was lying on the ground.  RT at 969.  A black wallet, later determined to belong

18  to petitioner, was on the ground 10 feet from the victim.  RT at 970.

19            Evidence technician Thomas Viglienzone found that Sutherland had a wallet in his pants

20  containing identification and $840.  RT at 1008.  Petitioner's wallet contained $40.  RT at 1009.

21            Pathologist Paul Hermann found that Sutherland died from multiple gunshots wounds.

22  RT at 797.  One bullet entered at the base of Sutherland's hand and stippling was observed about

23  the wound indicating the gun was discharged at close range.  RT at 792.  Sutherland's blood-alcohol

24  level registered at 0.02 percent.  RT at 797.

25            Technician Lansing Lee examined a .380 caliber automatic cartridge casing and

26  determined it was likely fired by a Lorcin or Jenning Bryco automatic pistol.  RT at 1042.

27  **Petitioner's Return to the Scene**

28            Police Officer Jason Lancaster saw petitioner come on to the scene of the shooting asking

1    for his lost wallet.  RT at 980.  Petitioner reported that he had been riding his bicycle when he

2    jumped the curb and possibly lost his wallet.  RT at 981.  The wallet found a few feet from the

3    victim contained petitioner's identification.  RT at 992.

4        Petitioner told Officer Frank Mendoza that he heard gunshots as he was riding his bicycle

5    near the scene.  RT at 1089.  Petitioner also reported that he saw somebody put something inside the

6    trunk of a small blue car.  RT at 1090-91.  As he rode his bicycle south, petitioner heard two to three

7    gunshots.  RT at 1091.  When he reached his girlfriend's home, petitioner noticed that he was

8    missing his wallet.  RT at 1092.  Petitioner told police that he could "possibly" identify the shooting

9    suspect.  RT at 1092.

10        Officer Wendy Percy drove petitioner to the stationhouse and heard him place a call to a

11    girlfriend and report that he had witnessed a crime and was talking to the police.  RT at 899, 901;

12    *see also* RT at 961.

13    **Police Investigation**

14        Oakland Police Sergeant Jeffrey Ferguson saw that petitioner matched Calhoun's

15    description of the shooter.  RT at 1106.  Near the scene, Sergeant Calhoun found a parked car that

16    matched the description of the suspect's car.  RT at 1107.  Later, Sergeant Ferguson went to a

17    residence identified by petitioner as belonging to his girlfriend, Donna Means-Taplin.  RT at 1108.

18    Ms. Means-Taplin reported that she had not seen petitioner's bicycle within the past month.  RT at

19    1110.  Ms. Means-Taplin reported that petitioner did not have her permission to drive her car.  RT

20    at 1111.  Ms. Means-Taplin pointed out  petitioner's backpack to the police.  RT at 963.  Police

21    found a black gun holster within petitioner's backpack.  RT at 964.  The police also recovered from

22    the floor of a closet petitioner's pants which were spotted with blood.  RT at 903-05.

23    **Donna Means-Taplin**

24        Donna Means-Taplin described herself as petitioner's ex-girlfriend.  RT at 856.  On May

25    6, 2001, Means-Taplin resided in an apartment on Adeline Street.  RT at 857.  That evening,

26    petitioner watched television at Means-Taplin's apartment.  RT at 860.  Means-Taplin owned a 1990

27    gold Acura Legend which petitioner sometimes drove.  RT at 864.  Means-Taplin fell asleep and

28    woke up when she heard her car start up sometime after 9:00 p.m.  RT at 867-68.  Means-Taplin

1   went outside and petitioner told her either that he was going to the store or to work.  RT at 868.

2   Around midnight, petitioner telephoned Means-Taplin and reported that he was at the police station

3   being questioned about a crime he witnessed.  RT at 868-69.  Petitioner said her car could be found

4   on Adeline and 27th Streets.  RT at 870.  Later, police officers arrived and searched her home.  RT

5   at 876.  Police seized petitioner's jeans and his backpack.  RT at 877-79.  Means-Taplin had a

6   restraining order against petitioner.  RT at 860.  Means-Taplin became afraid of petitioner after they

7   argued and he could not calm down.  RT at 862.  Means-Taplin was concerned whenever petitioner

8   did not ingest his medications because he could not calm down.  RT at 864.

9         **Petitioner's History With Clifford Sutherland**

10         Giant Burger restaurant owner Sang Hahn employed Clifton Sutherland and petitioner at

11   his restaurants.  RT at 1068, 1072.  At times, petitioner and Sutherland worked together.  RT at

12   1072.  Sutherland moved to Los Angeles but returned about 10 days before he was killed.  RT at

13   1072.  Hahn rehired Sutherland after he returned and as a result laid off petitioner.  RT at 1073-74.

14         **Inmate John Martinez**

15         Jail inmate John Martinez was charged with evading police officers, and aggravated

16   assault.  RT at 665.  Martinez has prior convictions of receiving stolen property, burglary,

17   aggravated assault, grand theft, and embezzlement.  RT at 666-67.  Martinez received no

18   consideration for testifying.  RT at 667.  Martinez admitted having mental health problems.  RT at

19   667.  The trial court took judicial notice that a trial court found Martinez incompetent in January

20   2001, and restored to competency in December 2001.  RT at 688-89.  The trial court also took

21   judicial notice that a trial court found Martinez incompetent in March 2002, and restored to

22   competency in August 2002.  RT at 688-89.

23         Martinez was petitioner's cellmate.  RT at 667.  In July 2003, Martinez heard petitioner

24   talk about watching brain matter splatter.  RT at 668.  Petitioner said he had shot someone in the

25   neck and saw the bullet exit through the jaw.  RT at 670.  Petitioner reported that the victim was his

26   co-worker at the Giant Burger restaurant.  RT at 670.  Petitioner reported that he and his victim ran

27   a "hustle" out of the Giant Burger, selling their own burger meat and keeping profits of about $200

28   per week.  RT at 670.  Petitioner reported that animosity developed between the two from the fact

1   that the same girl was romantically involved with both.  RT at 671.  The victim traveled to Los

2   Angeles in order to buy marijuana for both men to sell.  RT at 672-73.  Petitioner gave the victim

3   money to buy marijuana but the victim never delivered.  RT at 673.  At one point, petitioner

4   convinced a girl to lead the victim to a hotel room where petitioner planned to lie in wait but the girl

5   backed off.  RT at 673.  Petitioner complained that he had been laid off work because of the victim's

6   return.  RT at 675.  Petitioner reported that he traveled to the victim's home in order to kill him and

7   get his money back.  RT at 673, 677.  Petitioner kept his .380 caliber revolver in his back pocket and

8   obtained a plastic bag to catch the spent bullet casings.  RT 676.  Petitioner traveled to the victim's

9   home, argued with the victim, and started shooting.  RT at 676.  The victim called his roommate

10  David for assistance.  RT at 676.  Petitioner ditched the gun in the gutter and took off his pants.  RT

11  at 677-78.  When petitioner reached home he noted that his wallet was missing.  RT at 676.

12  Petitioner was arrested after he returned to the scene for his wallet.  RT at 676.  Petitioner reported

13  that he would kill again if he had to.  RT at 678.

14      At one point, DeAndre Calhoun's step father, Clay, was also housed with petitioner and

15  Martinez.  RT at 679.  Petitioner told Clay to talk to Calhoun about not testifying against him.  RT

16  at 681.  Clay said not to worry that he had advised Calhoun not to testify and ignore the subpoena.

17  RT at 679.  Petitioner reported that he planned to conduct research in the law library to develop an

18  "excessive violence" defense.  RT at 681-82.

19  **Petitioner's Statements**

20      Sergeant Jeffrey Ferguson identified the four taped statements petitioner gave police.  RT

21  at 1116-23.  All four statements were played for the jury.  RT at 1116-23.

22      Petitioner's fourth statement can be summarized as follows.  Petitioner reported that he

23  was driving his girlfriend's gold Acura Legend.  *See* Respondent's Exhibit F at 2 (People's Exhibit

24  33A).  Petitioner gave Sutherland $700 and Sutherland traveled to Los Angeles to buy marijuana.

25  *Id*. at 2-3.  After Sutherland returned from Los Angeles he did not return the money or deliver the

26  marijuana to petitioner.  *Id*. at 2-3.  Sutherland would answer, "'What money?'" whenever petitioner

27  inquired.  *Id*. at 3.  The men were coworkers.  *Id*. at 3.  The night of the shooting, petitioner drove

28  up while Sutherland was by his car in front of his residence.  *Id*. at 4-5.  Petitioner parked and

approached Sutherland. *Id*. at 5. Petitioner asked, "hey, what's up with my money man? . . ." *Id*. at 5. Sutherland answered that he did not owe any money or did not have petitioner's money at that moment. *Id*. at 5. Petitioner said that Sutherland "started comin' toward me" like "backin' up." *Id*. at 5. Petitioner said they wrestled and that petitioner backed up from Sutherland. *Id*. at 6. Sutherland came towards petitioner and called for David. *Id*. at 6. Petitioner had a black .380 caliber automatic gun with him. *Id*. at 6-7. The gun had been inside the trunk and petitioner retrieved it and put it in his back pocket before heading over to Sutherland's residence. *Id*. at 7-8. Petitioner knew that Sutherland carried a "little gun." *Id*. at 7. Petitioner pulled out his own gun when Sutherland started "rushin'" him. *Id*. at 8. Petitioner told Sutherland to stop. *Id*. at 8. Petitioner initially held the gun in his left hand before switching it to the right hand. *Id*. at 8. Petitioner pulled the trigger once and pulled it again because Sutherland kept coming. *Id*. at 8. Sutherland only fell to the ground after he turned as if reaching back for something. *Id*. at 8-9. Petitioner did not know how many times he fired but it was at least twice. *Id*. at 9. Sutherland said, "'You little punk! I was gonna give you your shit'" after he was shot. *Id*. at 13. Scared, petitioner ran back to the car. *Id*. at 9. Petitioner denied having a bag in his hand. *Id*. at 10. Petitioner threw the gun away into a park. *Id*. at 10. Petitioner changed his pants and returned to the scene to look for his wallet. *Id*. at 11. Petitioner described the gun as a Lorcin that contained five rounds. *Id*. at 12.

**Defense Case**

Donna Means-Taplin has observed petitioner lose his temper 10 to 20 times. RT at 1183. Petitioner loses his temper and cannot calm down when not on medication. RT at 1184. In May 2001, petitioner was not ingesting his medications. RT at 1184. On two occasions, petitioner hurt Means-Taplin which caused her to obtain a restraining order. RT at 1185. When he agreed to take his medications, Means-Taplin allowed petitioner back into her life. RT at 1185. Petitioner became "unpredictable" when he consumed alcohol. RT at 1187. On May 6, 2001, petitioner was "irritated," "preoccupied," and "uncomfortable." RT at 1189.

Petitioner's sister, Erica Blackmon, saw him on May 6, 2001. RT at 1211. He appeared "paranoid," "afraid," and "agitated." RT at 1211.

Forensic psychologist Steven Pittel interviewed petitioner, read the police reports, the witness statements, the preliminary hearing transcript, jail mental health records, and talked with petitioner's sister and girlfriends.  RT at 1237.  Mental health professionals at the jail diagnosed petitioner with Intermittent Explosive Personality Disorder.  RT at 1238.  Pittel agreed with the diagnosis.  RT at 1239.  Petitioner was prescribed Depakote, Paxil, and Benadryl.  RT at 1240.  Pittel opined that petitioner "probably" suffers from a neurological disorder.  RT at 1241.  Pittel opined that when petitioner experiences an episode of explosive disorder, he loses control, and "probably goes into a dissociative state," where he lacks logic or reason.  RT at 1247.

Psychologist Jules Burstein evaluated jail inmate John Martinez and diagnosed him with schizoaffective disorder with methamphetamine abuse.  RT at 1277.  A Patton State hospital diagnosis found that Martinez was malingering, had a methamphetamine induced psychological disorder, with adult antisocial behavior.  RT at 1281.  Burstein opined that an episode of Intermittent Explosive Personality Disorder can last seconds or minutes.  RT at 1299.

Petitioner testified that in May 2001, he was not ingesting his medications on a regular basis.  RT at 1347.  Sutherland offered to buy marijuana on petitioner's behalf.  RT at 1352.  Petitioner delivered $700 to Sutherland for marijuana.  RT at 1352.  Petitioner knew that Sutherland carried a handgun.  RT at 1354.  When Sutherland returned from his trip, he did not deliver money or marijuana to petitioner.  RT at 1355.  Sutherland reported that he had money for petitioner.  RT at 1355.  Petitioner owned a .380 caliber handgun.  RT at 1356.  On the day in question, petitioner went to San Francisco to help his sister with her car and took the gun to San Francisco for protection.  RT at 1357-58.

Petitioner eventually arrived at Mean-Taplin's residence at about 7:00 p.m.  RT at 1359.  At 10:00 or 10:30 p.m., petitioner left with his weapon in his pocket and traveled to Sutherland's residence to get his money.  RT at 1359-62.  When petitioner arrived, Sutherland was outside putting something into the trunk of his car.  RT at 1362.  Sutherland accused petitioner of taking his girl, Tiona, away.  RT at 1363.  When petitioner asked for his money, Sutherland "came and started coming" at petitioner.  RT at 1363.  Sutherland hit petitioner, scratching him.  RT at 1364.  The men wrestled.  RT at 1364.  Sutherland said, "come get this, motherfucker" and called for "Davy."  RT

1   at 1366.  Petitioner told Sutherland to "stop" as they struggled near Sutherland's blue car.  RT at

2   1367-68.  As Sutherland had petitioner against the car, petitioner pulled out his firearm.  RT at 1368.

3   Petitioner "backed up" and when Sutherland came at petitioner, petitioner tried to get away.  RT at

4   1368.  Petitioner told Sutherland to "stop" and petitioner next remembered hearing a "pow" from

5   the gun discharging.  RT at 1369.  Petitioner ran and drove off and threw the gun somewhere on

6   Adeline Street.  RT at 1369, 1371.  Petitioner brought a bag along to carry the marijuana.  RT at

7   1369.  At Mean-Taplin's residence, petitioner changed his pants and looked for his wallet.  RT at

8   1370.  Back at the scene, petitioner told police that the wallet they found belonged to him.  RT at

9   1371.  Petitioner thereafter lied to the police.  RT at 1371.  At the police station, petitioner called

10  Means-Taplin to tell her where her car was parked.  RT at 1374.  Petitioner did not intend to harm,

11  kill, shoot or provoke a fight with Sutherland.  RT at 1378.  Petitioner only remembered discharging

12  the first round and did not recall after that point.  RT at 1379.

13      **Rebuttal Case**

14          Officer Gus Galindo took petitioner's initial statement and did not yell at or threaten

15  petitioner.  RT at 1484.  Officer Galindo did not observe that petitioner had apparent injuries nor

16  were any brought to his attention.  RT at 1485.  Any injuries would have been photographed and

17  documented.  RT at 1485.

18                          **ARGUMENT**

19                              **I.**

20      **CALJIC NO. 5.17 DID NOT PREJUDICE PETITIONER**

21          Petitioner asserts that "[t]he 1995 revision of CALJIC No. 5.17, on the availability of

22  imperfect self-defense when the defendant is the aggressor, is incorrect and effectively negated, "etc.

23  [*sic*]  In this case, imperfect self-defense was not merely a theory of voluntary manslaughter as a

24  lesser-included offense of murder, it was one of the express defenses by petitioner."  *See* Petn. at 6.

25          The California Court of Appeal rejected the claim that the instruction was prejudicial, as

26  follows:

27          Appellant contends the trial court erred in giving the last paragraph of CALJIC No.
            5.17 (6th ed. 1995), regarding imperfect self-defense.

28

1    At the request of appellant's attorney, the trial court instructed the jury with CALJIC
2    No. 5.17, as follows:  "A person who kills another in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully but does not harbor malice aforethought and is not guilty of Murder.  This
3    would be so even though a reasonable person in the same situation, seeing and knowing the same facts, would not have had the same belief.  Such an actual but unreasonable
4    belief is not a defense to the crime of Voluntary Manslaughter.

5    "As used in this instruction, an imminent peril or danger means one that is apparent, present, immediate, and must be instantly dealt with, or must so appear at the time to the
6    slayer.

7    "*However, this principle is not available, and malice aforethought is not negated, if the Defendant, by his unlawful or wrongful conduct, created the circumstances which*
8    *legally justified his adversary's use of force, attack, or pursuit.*"  (Italics added.)

9    According to appellant, the final paragraph of the instruction is incorrect and effectively negated the principle of imperfect self-defense in this case, in violation of
10   appellant's federal constitutional rights.  Specifically, appellant claims this paragraph is misleading in that it creates the misimpression that a factual mistake as to which party is
11   the aggressor will disqualify the claim of imperfect self-defense if the defendant is objectively the aggressor.  Here, appellant avers, "the instructional error so obscured the
12   true scope and nature of [the doctrine of imperfect self-defense] . . . as to deprive appellant of his Sixth and Fourteenth Amendment right to present a defense of lesser culpability."

13
14   Respondent preliminarily argues that appellant waived this issue by failing to object in the trial court and request additional or clarifying language.  (See, e.g., *People v.*
15   *Dennis* (1998) 17 Cal.4th 468, 514 ["If defendant believed the instructions were incomplete or needed elaboration, it was his obligation to request additional or clarifying
16   instructions. [Citation.] His failure to do so waives the claim [on appeal]." [Citation.]])

17   Assuming, without deciding, that appellant's contention that the instruction was erroneous, rather than incomplete or unclear, means that the issue is not waived on appeal,
18   we nonetheless need not decide if the trial court erred in giving the last paragraph of CALJIC No. 5.17 because we find that any such purported error was harmless.  By
19   convicting appellant of first degree murder, the jury explicitly found that appellant acted willfully, deliberately, and with premeditation.   This finding is inconsistent with
20   appellant's having an actual, but unreasonable, belief that he needed to kill to defend himself.  The jury was instructed, pursuant to CALJIC No. 8.20, that "the word 'willful,'
21   as used in this instruction, means intentional. [¶] The word 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of
22   considerations for and against the proposed course of action.  The word 'premeditated' means considered beforehand."

23   In determining that appellant acted willfully, deliberately, and with premeditation, the jury necessarily rejected any lesser offense, such as second degree murder or
24   manslaughter.  (See, e.g., *People v. Seaton* (2001) 26 Cal.4th 598, 664-665, 669; *People v. Barnett* (1998) 17 Cal.4th 1044, 1156.)  In light of these findings by the jury, it is not
25   reasonably probable that a result more favorable to appellant would have been reached in the absence of the purported error. (See *People v. Breverman* (1998) 19 Cal.4th 142, 178,
26   citing *People v. Watson* (1956) 46 Cal.2d 818, 835-836.)

27   Exhibit B at 5-7 (.fns omitted).

28   In California, imperfect self-defense requires that the defendant fear "imminent danger

to life or great bodily injury. . . . Put simply, the trier of fact must find an actual fear of an imminent harm." *In re Christian S.,* 7 Cal.4th 768, 783 (1994). Thus, CALJIC No. 5.17 simply restates the principles found in *In re Christian S.,* 17 Cal.4th at 773, n. 1. Thus, there is no basis for concluding the standard instruction misstated the law. *See People v. Hardin,* 85 Cal.App.4th 625, 634 (2000) (CALJIC No. 5.17 is legally correct).

CALJIC No. 5.17 instructs that "[a] person, who causes the death of another person while acting under the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, causes an unlawful death, but does not harbor malice aforethought and is not guilty of murder." RT at 1611-12. Further, in this case, the trial court instructed the jury with other standard self-defense instructions, including CALJIC No. 5.50 (Self-Defense—Assailed Person Need Not Retreat), and with CALJIC No. 5.51 (Self-Defense—Actual Danger Not Necessary). CT at 286-87. The trial court also instructed that if petitioner killed without malice, then he could not be guilty of murder, but only of manslaughter. The jurors were instructed that if the killing was committed in conscious disregard for human life, petitioner would be guilty of voluntary manslaughter. CT at 290 (CALJIC No. 8.40). The trial court explained the terms sudden quarrel, heat of passion, and provocation. CT at 291 (CALJIC No. 8.42). The court then explained what emotion constitutes heat of passion. CT at 292 (CALJIC No. 8.44). The jury was told that if petitioner had an actual but unreasonable belief in the need to defend himself, he would be guilty of manslaughter. CT at 292 (CALJIC No. 8.50).

When one considers the language of the jury instructions given as a whole, one can be satisfied that the trial court adequately instructed jurors of the circumstances in which imperfect self-defense would support a verdict of voluntary manslaughter. *See Estelle v. McGuire,* 502 U.S. 62, 72 .n4. Accordingly, petitioner's claim that a reasonable juror could construe the trial court's instructions as requiring the rejection of voluntary manslaughter even when the circumstances showed that a defense of imperfect self-defense applied, is baseless.

Moreover, the challenged instruction was not prejudicial. Here, there was no substantial evidence that petitioner feared imminent harm when he shot at Sutherland. DeAndre Calhoun saw Sutherland back away from petitioner, saying "no" three separate times. RT at 605-06. Sutherland

1  had no weapon, nor did he advance at petitioner before petitioner shot Sutherland four times at close

2  range. RT at 606-07.    Petitioner old fellow inmate Martinez that he traveled to Sutherland's

3  residence to get his money back and kill Sutherland. RT at 673, 677. Arresting officers found no

4  sign of injury on petitioner's person and petitioner complained of none. RT at 1485. Defense

5  counsel argued that the evidence showed only that petitioner was guilty of voluntary manslaughter

6  because he suffered from an episode of Intermittent Explosive Disorder and experienced no

7  conscious decision-making when shooting at Sutherland. RT at 1553-60, 1566. The jury rejected

8  that defense because they disbelieved petitioner's uncorroborated self-serving testimony.

9  Accordingly, as the California Court of Appeal found, the jury necessarily found that petitioner

10  acted with deliberation and premeditation in killing Sutherland and returned a verdict of first degree

11  murder. Indeed, the challenged instruction did not have a substantial or injurious influence on the

12  verdict under *Brecht v. Abrahamson*, 507 U.S. at 623.

13      In the instant case, petitioner has not carried his burden of showing that there was a

14  reasonable likelihood that the jury applied the challenged instruction in an unconstitutional manner.

15  *Estelle v. McGuire*, 502 U.S. at 72 (reasonable likelihood test).

16      It therefore cannot be said that the state courts' rejection of petitioner's claim was contrary

17  to, or an unreasonable application of Supreme Court precedent. 28 U.S.C. § 2254(d).

18                                          **II.**

19      **REASONABLY COMPETENT COUNSEL WAS NOT REQUIRED TO
        REQUEST MODIFICATION TO CALJIC NO. 5.17**

20

21      Petitioner faults trial counsel for requesting an unmodified version of CALJIC No. 5.17.

22  Petn. at 6.

23      The record shows that defense counsel requested CALJIC No. 5.17. CT at 266. At the

24  conference on proposed instructions, the trial court granted the defense request for CALJIC No.

25  5.17. RT at 1514. Petitioner has not obtained a declaration from trial counsel explaining this aspect

26  of his representation. There is no showing that reasonably competent counsel was ineffective for

27  requesting an unmodified version of CALJIC No. 5.17.

28      In all events, no prejudice is demonstrated from counsel's actions. *Strickland v.*

*Washington*, 466 U.S. 668, 687 (1984).  The California Court of Appeal found any error in giving

CALJIC No. 5.17 was harmless:

> [W]e nonetheless need not decide if the trial court erred in giving the last paragraph of CALJIC No. 5.17 because we find that any such purported error was harmless.  By convicting appellant of first degree murder, the jury explicitly found that appellant acted willfully, deliberately, and with premeditation.  This finding is inconsistent with appellant's having an actual, but unreasonable, belief that he needed to kill to defend himself.  The jury was instructed, pursuant to CALJIC No. 8.20, that "[t]he word 'willful,' as used in this instruction, means intentional.  [¶]  The word 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.  The word 'premeditated' means considered beforehand."
>
> In determining that appellant acted willfully, deliberately, and with premeditation, the jury necessarily rejected any lesser offense, such as second degree murder or manslaughter.  (See, e.g., *People v. Seaton* (2001) 26 Cal.4th 598, 664-665, 669; *People v. Barnett* (1998) 17 Cal.4th 1044, 1156.)  In light of these findings by the jury, it is not reasonably probable that a result more favorable to appellant would have been reached in the absence of the purported error.  (See *People v. Breverman* (1998) 19 Cal.4th 142, 178, citing *People v. Watson* (1956) 46 Cal.2d 818, 835-836.)

Exhibit B at 7, .fns omitted.  For these reasons, petitioner cannot demonstrate that in the absence of

trial counsel's actions, there was a reasonable probability of a more favorable result.  *Strickland v.*

*Washington,*  466 U.S. at 687.

The state court's denial of petitioner's ineffective assistance claim was not based on an

unreasonable determination of fact and did not involve an unreasonable application of *Strickland*.

### III.

### REASONABLY COMPETENT COUNSEL WAS NOT REQUIRED TO INTERVIEW A PROSECUTION WITNESS BEFORE TRIAL

Petitioner next faults trial counsel for failing to interview Deandre Calhoun before trial,

in order to prepare effective cross-examination.  *See* Respondent's Exhibit E at 12-15.[1/]  Petitioner

does not demonstrate ineffective representation.

No indication exists that DeAndre Calhoun was willing to talk to defense counsel before

trial.  Moreover, petitioner does not establish that an interview would have triggered cross-

---

1.  This claim is cut off in the first amended petition, and thus respondent refers to petitioner's California Supreme Court habeas petition for the remainder of the claim.  *See* Exhibit E at 12-15.

examination blunting Calhoun's testimony that he saw the victim back away from petitioner, saying "no" three separate times before petitioner shot four times at close range. RT at 605-06. The victim had no weapon, nor did he advance at petitioner before being shot. RT at 606-07. The jury also heard inmate John Martinez testify that petitioner said he traveled to the victim's residence to get his money back and kill the victim. RT at 673, 677. On this record demonstrating overwhelming guilt, petitioner does not demonstrate that counsel's failure to interview Calhoun prejudiced him. For these reasons, petitioner cannot demonstrate that in the absence of trial counsel's actions, there was a reasonable probability of a more favorable result. *Strickland v. Washington,* 466 U.S. at 687.

The state court's denial of petitioner's ineffective assistance claim was not based on an unreasonable determination of fact and did not involve an unreasonable application of *Strickland*.

## IV.

### THE TRIAL COURT DID NOT DENY PETITIONER'S SIXTH AMENDMENT RIGHT TO COUNSEL WHEN IT CONSIDERED HIS COMPLAINTS ABOUT COUNSEL

Last, petitioner asserts that the trial court conducted an inadequate inquiry while hearing his pretrial motion to substitute counsel pursuant to *People v. Marsden*, 2 Cal.3d 118 (1970). Petn. at 6.

Respondent has obtained a copy of the sealed transcript of the February 25, 2004, hearing and has provided it to this court. *See* Respondent's Exhibit G. The record does not demonstrate that the trial court failed to conduct an adequate inquiry. *Id.* The trial court inquired into petitioner's complaints and heard counsel's response. After making inquiries of petitioner and defense counsel, the court denied the motion. *Id.* at 14-18. Nothing in the trial court's decision violates the Constitution. *See Schell v. Witek*, 218 F.3d 1017, 1027 (9th Cir. 2000) (en banc) (stating that "not every conflict or disagreement between the defendant and counsel implicates Sixth Amendment rights").

The state courts correctly concluded that petitioner was not denied his Sixth Amendment right to counsel because there was no conflict or breakdown of communication between attorney and client that prevented effective representation. *Schell v. Witek*, 218 F.3d at 1026.

The state courts' denial of petitioner's claim was not based on an unreasonable

1   determination of fact and did not involve an unreasonable application of Supreme Court precedent.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CONCLUSION**

2        Accordingly, respondent respectfully requests that the Court deny the petition for writ of

3    habeas corpus.

4            Dated:  June 30, 2008

5                                Respectfully submitted,

6                                EDMUND G. BROWN JR.
                                 Attorney General of the State of California

7

8                                DANE R. GILLETTE
                                 Chief Assistant Attorney General

9

10                               GERALD A. ENGLER
                                 Senior Assistant Attorney General

11                               GREGORY A. OTT
                                 Deputy Attorney General

12

13

14                               /s/ *René A. Chacón*
                                 RENÉ A. CHACÓN

15                               Supervising Deputy Attorney General

16                               Attorneys for Respondent

17    RAC:eaw

18    20119239.wpd
      SF2008401172

19

20

21

22

23

24

25

26

27

28

Memo. of Ps & As in Support of Answer - No. C 07-3838 JSW (PR)

17

1

**TABLE OF CONTENTS**

2                                                                                          **Page**

3    INTRODUCTION                                                                              1

4    STATEMENT OF THE CASE                                                                     2

5    LEGAL STANDARDS                                                                           3

6    STATEMENT OF FACTS                                                                        3

7            May 6, 2001, Shooting Of Clifford Sutherland                                      3

8            Forensic Evidence                                                                 4

9            Petitioner's Return to The Scene                                                  4

10           Police Investigation                                                              5

11           Donna Means-Taplin                                                                5

12           Petitioner's History With Clifford Sutherland                                     6

13           Inmate John Martinez                                                              6

14           Petitioner's Statements                                                           7

15           Defense Case                                                                      8

16           Rebuttal Case                                                                     10

17   ARGUMENT                                                                                  10

18       I.    CALJIC NO. 5.17 DID NOT PREJUDICE PETITIONER                                    10

19       II.   REASONABLY   COMPETENT   COUNSEL   WAS   NOT
              REQUIRED TO REQUEST MODIFICATION TO CALJIC NO.
20            5.17                                                                             13

21       III.  REASONABLY   COMPETENT   COUNSEL   WAS   NOT
              REQUIRED TO INTERVIEW A PROSECUTION WITNESS
22            BEFORE TRIAL                                                                     14

23       IV.   THE TRIAL COURT DID NOT DENY PETITIONER'S SIXTH
              AMENDMENT RIGHT TO COUNSEL WHEN IT CONSIDERED
24            HIS COMPLAINTS ABOUT COUNSEL                                                     15

25   CONCLUSION                                                                                16

26

27

28

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**Cases**

4 *Crane v. Kentucky*
   476 U.S. 683 .......................................................................................... 2
5

   *Edwards v. Lamarque*
6  476 F.3d 1121 (9th Cir. 2007) (en banc) .......................................... 3

7  *Estelle v. McGuire*
   502 U.S. 62 ...................................................................................... 12, 13
8

   *In re Christian S.,*
9  7 Cal.4th 768 (1994) ...................................................................... 11, 12

10 *In re Clark*
   5 Cal.4th 750 (1993) .......................................................................... 2
11

   *In re Miller*
12 17 Cal.2d 734 (1941) ........................................................................ 2

13 *In re Robbins*
   18 Cal.4th 770 .................................................................................. 2
14

   *Lockyer v. Andrade*
15 538 U.S. 63 (2003) ............................................................................ 3

16 *People v. Barnett*
   (1998) 17 Cal.4th 1044 .................................................................. 11, 14
17

   *People v. Breverman*
18 (1998) 19 Cal.4th 142 .................................................................... 11, 14

19 *People v. Dennis*
   (1998) 17 Cal.4th 468 ...................................................................... 11
20

   *People v. Hardin*
21 85 Cal.App.4th 625 (2000) .............................................................. 12

22 *People v. Marsden*
   2 Cal.3d 118 (1970) .......................................................................... 15
23

   *People v. Seaton*
24 (2001) 26 Cal.4th 598 .................................................................... 11, 14

25 *People v. Watson*
   (1956) 46 Cal.2d 818 ........................................................................ 11
26

   *Schell v. Witek*
27 218 F.3d 1017 (9th Cir. 2000) (en banc) ........................................ 15

28

**TABLE OF AUTHORITIES  (continued)**

**Page**

*Strickland v. Washington*
466 U.S. 668 (1984)                                                                              13-15

*Woodford v. Visciotti*
537 U.S. 19 (2002) (per curiam)                                                                    3


**Constitutional Provisions**

United States Constitution
        Sixth Amendment                                                                         2, 15

**Statutes**

California Penal Code
        § 187( a)                                                                                 1, 2
        § 1192.7 (c)(8)                                                                           1, 2
        § 1203.06 (a)(1)                                                                          1, 2
        § 1203.075                                                                                1, 2
        § 12021(c)(1)                                                                             1, 2
        § 12022.5 (a)(1)                                                                          1, 2
        § 12022.53 (b)-(d)                                                                        1, 2

28 U.S.C.
        § 2254                                                                                    1, 3
        § 2254(d).                                                                                 13
        § 2254(d)(1)                                                                             3, 10

**Other Authorities**

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)                                       3

California Jury Instructions – Criminal
        No. 5.17                                                                              2, 12-14
        No. 5.50                                                                                   12
        No. 5.51                                                                                   12
        No. 8.20                                                                               11, 14
        No. 8.40                                                                                   12
        No. 8.42                                                                                   12
        No. 8.44                                                                                   12
        No. 8.50                                                                                   12